# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | **:** | **Case No. 1:20-cr-00798** |
| **Plaintiff,** | **:** | **Judge SOLOMON OLIVER JR.** |
| **v.** | **:** | |
| **ARTHUR FAYNE,** | **:** | |
| **Defendant.** | **:** | |

## DEFENDANT'S SENTENCING MEMORANDUM

### I.

### OVERVIEW

Now comes Defendant, Arthur Fayne, by and through counsel, and respectfully submits the following sentencing memorandum, with exhibits, to assist this Honorable Court in determining a sentence "sufficient, but not greater than necessary" to achieve the statutory purposes of punishment as required by 18 U.S.C. §3553(a).

On October 19, 2023 Defendant Arthur Fayne, 61, was found guilty at trial of nine counts of wire fraud.  The charges stem from Mr. Fayne's ownership of Business Development Concepts, a business consulting and training firm that also managed construction projects.    Specifically, Mr. Fayne was convicted of embezzling funds intended for the development of New East Side Market, a project that involved converting a vacant building into a grocery store and

1

community center with healthcare offices in Cleveland's Glenville neighborhood.

At the outset, it is important to note that the New East Side Market project was completed and continues to be a thriving concern, operating seven days a week and providing a valuable service to an underserved community in Cleveland. In 2021, some two years after it opened, local station WKYC reported:

> Cleveland's Glenville neighborhood is considered a "food desert" - which, according to the United States Department of Agriculture, is an area where people have limited access to a variety of healthy and affordable food. Not having that access could lead to other health challenges like obesity. It's why Northeast Ohio Neighborhood Health Services (NEON) stepped up to the plate.

As will be presented in this memorandum and its attachments, Mr. Fayne is a good man who has done much good work in his life and, as will be demonstrated, in this project was attempting to accomplish positive things for an underserved community. The defense respectfully submits that the totality of mitigating factors that are present in this case support a non-guideline, non-incarceratory sentence, with appropriate conditions that could include a suitable term of Home Confinement and substantial Community Service.

2

## II.

## COMMENTS ON THE ADVISORY GUIDELINES

On December 2, 2020, the U.S. Attorney's Office for the Northern District of Ohio, filed a nine-count Indictment charging Arthur Fayne with wire fraud. Counts 1 through 7 charge Mr. Fayne with acts committed between January and September 2017, in violation of 18 U.S.C. §1343 and counts 8 and 9 charge him acts committed on June 26, 2018 and June 28, 2018 in violation of 18 U.S.C. §§1343 and  2.   Mr. Fayne appeared on a summons and was released on bond on December 28, 2020.

Arthur Fayne has owned and managed Business Development Concepts (BDC) since 2009.  As the principal of BDC, Arthur has been responsible for managing and directing real estate development projects with a special emphasis on health and wellness domains in urban market areas.  Northeast Ohio Neighborhood Health Services (NEON) is a nonprofit corporation operating as a federally qualified network of community health centers providing primary care medical services in the Cleveland area.  The Government's theory of Arthur's wrongdoing stems from the relationship between NEON and Arthur in development of the Eastside Project, with emphasis on Arthur's control of the project, especially with regard to payments to vendors.  Arthur has now been convicted of embezzling funds intended for the project, resulting in an alleged loss amount of over $900,000.

Mr. Fayne, with the assistance of counsel, has reviewed the Probation Office's Presentence Report (hereinafter PSR).  The PSR calculates a total offense

level of 25, derived from a base offense level of 7 [U.S.S.G. §§2B1.1]; a 14-level increase because the loss amount exceeded $550,000 [U.S.S.G. § 2B1.1(b)(1)(H)]; a 2-level increase for role in the offense based on abuse of a position of public or private trust [U.S.S.G. § 3B1.3]; and a 2-level increase for obstruction of justice [U.S.S.G. §3C1.1] [PSR p. 7 ¶¶ 19-27].  At Criminal History Category II, this corresponds to an advisory guideline range of 63 to 78 months.

As will be shown below, the Probation Office's computation is wrong on several counts.  First, no specific offense characteristics should be added for Loss Amount, as no loss was actually sustained, nor was any loss intended, by Mr. Fayne.  Second, the adjustment for Obstruction of Justice is unwarranted here and should not be applied.  And third, placement in Criminal History Category II would overstate the seriousness of Mr. Fayne's prior record; he should be sentenced within Category I instead.  In sum, his correct advisory guidelines are Level 9, Criminal History Category I, with an advisory range of 4-10 months. Under 18 U.S.C. §3553(a), however, a downward variance is merited.  There is no need for a prison sentence to be imposed on a non-violent offender such as Mr. Fayne, who has overcome adversity and contributed so much to the community over the years of his lifetime.  A sentence of Probation with Home Confinement and Community Service would effectuate justice and satisfy §3553(a).

### III.

### THE GOVERNMENT'S LOSS CALCULATIONS ARE FUNDAMENTALLY FLAWED AND VASTLY OVERSTATED

Mr. Fayne, through counsel, submitted objections to the PSR with regard to

loss amount which read, in part:

> In actuality, all three representatives of the alleged victims
> in this case testified under penalty of perjury that they
> suffered no actual loss as a result of [the defendant's]
> conduct regarding the Eastside Market.  Willie Austin
> testified at trial that NEON suffered no loss resulting from
> the Eastside Market project; Gareth Vaughn from Higley
> [the company contracted to construct the project] testified
> that his company suffered no such loss; and Michael
> Hines from Crescent [the audio-visual contractor also
> involved in the project] testified on cross examination that
> his entity suffered no loss from [the defendant's] conduct.
> [Revised PSR, p. 22]

In the revised PSR filed on February 26, 2024, the Probation Officer responds to this objection by asserting that:

> NEON experienced a loss because funds they gave the
> defendant were not paid to vendors for their work. NEON
> received additional funds from sources such as local, state,
> and federal governments or grants, which they later used to
> pay vendors for their work.

The Probation Officer's assertion that "NEON experienced a loss because funds they gave the defendant were not paid to vendors for their work" is factually incorrect. As will be shown conclusively herein, Mr.Fayne has fully accounted for

all of the project funds placed under his control by a)  paying AHC and, crucially, b) paying other East Side Market vendors amounts that in fact exceed the amount of all funds he received from NEON.   The following analysis leaves no doubt that NEON suffered no loss—which is consistent with the testimony under oath of NEON managemen.t

***A. Counts 1-7: The government claims Arthur Fayne caused loss to  NEON of $807,710 but NEON experienced no loss and analysis shows that Fayne in fact Received $3,283,941.54 in project advances and disbursed $3,515,684.15m in approved ESM project expenditures.***

The Government has selected an arbitrary 15 month segment of a 36 month construction project and "carved out" this segment for analysis, ignoring what happened before and after the segment.  This approach is fundamentally flawed because the only way to legitimately analyze a construction project is to look at the totality of the project from inception to completion, not a random segment.   That said, for the purposes of providing analysis that matches the government's selected period,  the analysis that follows addresses only the exact fifteen month period from December 1, 2016 to March 21, 2018 that the government has chosen to focus on.

The government asserts that during this fifteen month period BDC received $2,629,740.38 from NEON that was earmarked for payments to The A. M. Higley Company (AHC), the general contractor for the New East Side Market (ESM) construction project, but only paid out $1,870,634.46 to AHC and therefore must have retained the balance of $759,105.92 which then becomes the main component of the  "loss amount" for these counts.   This grossly and, it could be argued,

6

willfully misrepresents the true situation, which was that Fayne/BDC received more than just the $2,629,740.38 earmarked for AHC – he received a total of $3,283,941.54 from NEON for payments to AHC plus payments to more than a dozen other vendors. (See Exhibit B invoice requests to NEON showing all vendors for whom money was requested, not just AHC.) This total of $3,283,941.54 includes the $2,629,740.38 for AHC plus $654,201.16 earmarked for other vendors, as per the funding requests/invoices he had sent to NEON. The only valid way to assess Fayne's performance, therefore, is to not simply look at the AHC component – but rather it is necessary to look at the totality of project advances he received for this 15 month period, and project disbursements he made.

Having received and become accountable for $3,283,941.54, financial records show that Arthur Fayne/BDC disbursed $1,870,634.46 to AHC, plus another $1,645,049.69 to other approved vendors, for total disbursements of $3,515.684.15 against funding received for $3,283,941.54. (See Exhibit C for the complete list of vendor payments totaling $1,645,049.69. Thus not only did Fayne not "retain" the $759,105.92 the government claims as loss – he redirected those funds to other project expenses and disbursed that amount and more to approved vendors for approved ESM expenses, eventually making bonafide, approved project disbursements that exceeded the advances received by $231,742.61.

The following chart confirms the foregoing narrative, which is the true actual

situation with regard to project funding received by Arthur Fayne/BDC and project funding disbursed during the government's selected period:

|  | PSR/Government | Actual |
|---|---|---|
| **INVOICES AND FUNDS RECEIVED** |  |  |
| Amount invoiced by BDC to CIS/NEON for AMHigley (AHC) | $2,629,740.38 | $2,629,740.38 |
| Amount invoiced by BDC to CIS/NEON for other ESM Vendors | Not Stated | 654,201.16 |
| Total amount invoiced by BDC to CIS/NEON for all ESM Vendors | Not Stated | $3,283,941.54 |
| Funds received from CIS/NEON | $2,629,740.38 | $3,283,941.54 |
| **PAYMENTS DISBURSED** |  |  |
| BDC Payments to AHC | $1,870,634.46 | $1,870,634.46 |
| BDC Payments to other ESM Vendors | Not Stated | $1,645,049.69 |
| Total Payments | $1,870,634.46 | $3,515,684.15 |
| Amount Overpaid (Underpaid) vs Invoiced Amount | ($759,105.92) | $990,848.53 |
| Net (Deficit) or Excess Disbursed | ($759,105.92) | $231,742.61 |

Thus for the period in question, when all invoices and payments are considered (not just AHC), BDC/Fayne received $3,283,941.54 in advances from NEON and paid out $3,515,684.15 for approved ESM expenses, leaving BDC "out of pocket" $231,742.61 for amounts disbursed in excess of amounts received.

The only question that remains to be addressed regarding Counts 1-8 is why did the funding requests overstate the amounts ultimately paid to AHC and understate the amounts ultimately paid to other vendors. The answer to that is that

8

the project experienced numerous issues including a stoppage in February 2018 wherein Fayne was directed to stop payments to AHC. With payments to AHC suspended, Fayne and Willie Austin of NEON agreed Fayne could use unexpended funds originally intended for AHC to pay other vendors during the period of the pause in payments to AHC. Thus while BDC initially underpaid AHC by $759,105.92 based on the invoices, it liquidated this amount and more by redirecting it to payments to other vendors—payments which eventually exceeded funds received by $231,742.61

## B. Counts 8-9: The Government Claims Arthur Fayne Retained $125,923.86 originally intended Crescent Digital. This amount was fully paid and there is no loss.

The government offers a tortured explanation of what happened with this vendor which is easily belied by the following simple reconciliation table:

| | |
|---|---|
| Original Contract | $251,297.24 |
| Change Orders | $86,849.22 |
| Revised Contract Total | $328,146.46 |
| Paid from Loan | ($90,373.38) |
| Paid from BDC | ($87,451.25) |
| Net Owed | $160,321.83 |
| Paid by BDC via wire 2/14/20 | ($30,000.00) |
| Paid by BDC via wire 5/2/20 | ($99,757.39) |
| Amount Owed | $30,564.44 |

In this matter, the government focused its accusations on the fact that near the outset, CD returned $125,923.86 which Defendant placed in his wife's personal account, but as the chart above and other documentation shows, this is irrelevant

9

given the payments that were eventually made by BDC – payments which, contrary to the PSR's assertion that they were made after the indictment in the instant case, were in fact made well before the indictment date of December 2, 2020,  and further, were made at the time they were requested by tis and he recipient – as testified to by CD's CEO at trial.  Finally it is noted that the $30,564.44 balance was in fact a disputed amount having to do with change orders that were not accepted, and is not a shortfall chargeable to Arthur Fayne. CD ultimately accepted this and  in trial testimony CD's CEO  Mike Hines confirmed that Crescent Digital was fully paid and had no outstanding claims against Fayne, BDC, or NEON.

### Conclusion: There is No Loss, Intended or Actual

The foregoing narrative, supplemented by the exhibits provided,  is a clear, precise, comprehensive reconciliation analysis showing that Arthur Fayne and BDC ultimately made disbursements on legitimate project expenses that exceeded the amounts received from NEON in the period under analysis.   Accordingly there is no loss, intended or actual – a conclusion that is asserted herein and is supported by the final report and findings of defense forensic accounting expert Timothy D. Mayles, CPA, CFE, CFF.

The Court is respectfully urged to give careful consideration to the testimony under oath of multiple parties including "victims" Austin, Vaughn, and Hines, all of whom testified under oath that NEON is not a victim; that NEON suffered no loss;

10

that NEON auditors confirmed there was no loss; and that all vendors were fully paid when the project was complete.  This is further confirmed by the unrefuted testimony of forensic accountant Timothy D. Mayles

### C. *An Overly Mechanical Reliance on the Loss Table is Flawed*

In an article published in 2021 in the *Ohio State Journal of Criminal Law*, authors Barry Boss and Kara Kapp argue convincingly that loss amount in economic crimes is routinely misapplied by prosecutors in order to arrive at guideline calculations, and resultant sentencing recommendations, that are untethered from subjective considerations that make every case different, and go against the more common sense post-Booker approach that calls on judges to arrive at a sentence that is reasonable.

In this regard the Sixth Circuit has stated: "Many times we have emphasized that a district court's mandate is to impose a sentence sufficient, but not greater than necessary to comply with the purpose set forth in §3553(a)(2)."  *United States v. Yopp*, 453 F3d 770, 773 (6th Cir. 2006).  The Sixth Circuit has explained further that the role of the sentencing court is as follows: "[A] district court's job is not to impose a 'reasonable' sentence.  Rather, a district court's mandate is to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2).  Reasonableness is the appellate standard of review in judging

11

whether a district court has accomplished its task." *United States v. Foreman*, 436

F.3d 638, 644 n.1 (6th Cir. 2006).

And, the Seventh Circuit has stated that post-Rita "[t]he district courts must

calculate the advisory sentencing guideline range accurately, so that they can derive

whatever insight the guidelines have to offer, but ultimately they must sentence

based on 18 U.S.C. §3553(a) without any thumb on the scale favoring a guideline

sentence." *United States. v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir. 2007).

In their article, entitled "How the Economic Loss Guideline Lost its Way, and

How to Save It" [*OHIO STATE JOURNAL OF CRIMINAL LAW* Vol: 18.2:605]

Boss and Kapp begin:

> This Article revisits a stubborn problem that has been
> explored by commentators repeatedly over the past thirty
> years, but which remains unresolved to this day. The
> economic crimes Guideline, Section 2B1.1 of the United
> States Sentencing Manual, routinely recommends arbitrary,
> disproportionate, and often draconian sentences to first-
> time offenders of economic crimes.  These disproportionate
> sentences are driven primarily by Section 2B1.1's current
> loss table, which has an outsized role in determining the
> length of an economic crime offender's sentence.
> Moreover, this deep flaw in the Guideline's design has led
> many judges to lose confidence entirely in the Guideline's

12

recommended sentences, leading to a wide disparity of sentences issued to similarly situated economic crime offenders across the country.  Accordingly, this Guideline has failed to address the primary problem it was designed to solve—unwarranted disparities among similarly situated offenders. Worse still, it not only has failed to prevent such unwarranted disparities, its underlying design actively exacerbates them.

After a thorough analysis of how application of the loss table results in unwarranted sentencing disparities, the authors observe:

> The gulf between the economic crimes Guideline and the average sentences issued under this Guideline results in particularly unfair punishment for offenders sentenced by "Guidelines" judges who do not, absent government cooperation or extraordinary circumstances, vary or depart downward, and who do not vary downward based on the harshness of the loss tables. As a result, similarly situated offenders sentenced in different jurisdictions can receive wildly divergent sentences, despite the fact that this is precisely the problem the Guidelines were meant to address and correct.

They also observe that changes in the loss table over the years have become increasingly detached from the mandate to base the advisory guidelines on empirical

13

data:

> In addition, the loss table should be anchored in empirical
> data. As the Supreme Court recognized in *Kimbrough*,
> Guidelines that reflect empirical data of prior judicial
> practice serve a critical institutional role to the courts—
> offering insight into national sentencing practice to help
> courts avoid unwarranted sentencing disparities.

In Mr. Fayne's case, the prosecution falls into the trap of arbitrary calculation of loss, with the apparent intent to arrive at the highest number possible, based on unreasonable and irrational considerations. This is not in the spirit of changes shaped by U.S. v. Booker, 543 U.S. 220 (2005) and its progeny. Mr. Fayne, through counsel, contends that given the slippery nature of the application of loss arguments, the Government's and the PSR's contention that the loss amount here is anything greater than zero is flawed and should be disregarded.

## IV.
## THE ADJUSTMENT FOR
## OBSTRUCTION OF JUSTICE IS ALSO MISAPPLIED

In its 11th hour objection to the PSR, the Government argues that the Obstructing or Impeding the Administration of Justice enhancement pursuant to U.S.S.G. §3C1.1 should be applied. The Probation Officer agreed. As with their loss argument, the Government again overreaches with the claim that Arthur Fayne obstructed justice. This contention is apparently based on a single email that the Government believes demonstrates obstruction. The revised PSR states:

14

>Specifically, the defendant sent an email to the CFO of
>NEON asking the CFO to increase the fees owed to BDC.
>This change would have reduced the loss amount and
>restitution to the victim, NEON, in the instant case, which
>would have created a benefit to the defendant. [Revised
>PSR, p.22]

The use of the conditional "would have" (twice) in this paragraph is telling. Once again, the Government's theory is based on pure speculation and a misconstrued interpretation of the email in question. The simpler and more correct explanation is that Arthur contacted the CFO, Laing Chen, to have him correct a mistake in the way Chen was recording expenses related to the Eastside Market project. At the time of the email in question, Willie Austin was ill and hospitalized. During this period of incapacitation, Arthur, still in his capacity as owner of BDC, assumed the role of providing funding for the day-to-day operations of the Eastside project. In essence, Mr. Austin provided Arthur with checks intended to pay Eastside's bills.

To clarify, NEON gave money to BDC and that money was passed through to Eastside Market to pay expenses, particularly payroll. On NEON's books, however, Mr. Chen was recording these transactions as an "expense" to BDC. In the email, Arthur was simply informing Chen that the "expense" was to East Side Market,

since that is where the money ultimately wound up.  The government apparently

believes that Arthur's intention was to increase development costs, thereby

increasing his fee.  This is simply wrong.  In fact, the expenses in question were

operating expenses and therefore had no connection to development costs and thus

had no impact on Arthur's fee.

In sum, the Government's theory here should be rejected outright and the

obstruction adjustment should not apply.

## V.
## THE DEFENDANT'S CRIMINAL HISTORY IS OVERSTATED
## BY A CRIMINAL HISTORY CATEGORY OF II

Mr. Fayne, through counsel, also submits that Category II overstates his

criminal history and, again like the loss argument, constitutes an overly mechanical

application of the advisory guidelines.  The Guidelines specifically provide that a

sentencing court may depart downward if the applicable criminal history category

"substantially over-represents the seriousness of a defendant's criminal history or

the likelihood that a defendant will commit other crimes…" U.S.S.G. §4A1.  In

determining whether a defendant's criminal history is overrepresented, courts may

consider the following factors: (1) the age of the prior convictions; (2) the

defendant's age at the time of the priors; (3) whether drug and alcohol use were

involved in the priors; (4) the circumstances of the prior offenses; (5) the length of

the prior sentences; (6) the circumstances of the defendant's life at the time of the

priors; and (7) the proximity of the priors.  See United States v. Hammond, 240

F.Supp.2d 872, 877-80 (E.D. Wisc. 2003).  All of these factors weigh in favor of overrepresentation of Mr. Fayne's criminal history.

The first of Mr. Fayne's two criminal history points is derived from a DUI conviction in Torrance, California, sustained in July 2016.  In that case he received a sentence of three years probation, with was terminated after one year. The second point stems from a curious misdemeanor charge of unauthorized use of a "property computer system" combined with a second misdemeanor charge of obstructing official business, both sustained in 2018.  The PSR provides no details on this case but it can be presumed that because the sentence was only 6 months of inactive probation, the offense was not deemed of great consequence.

As to the DUI, this was obviously related to Mr. Fayne's history of substance abuse, which dates to his teenage years.  As will be detailed below, Mr. Fayne grew up in extremely difficult circumstances and adult supervision was sporadic to say the least.  Indeed, Mr. Fayne reports that when he was a young child he was exposed to alcohol and gambling on a regular basis because his uncle ran an "after hours" establishment in the basement of the building where Mr. Fayne lived upstairs with his mother and his siblings.    He reports that he and his siblings were frequently called upon to clean up after closing time.  Mr. Fayne reports that in this environment he first used alcohol, marijuana, and cocaine when he was 14 years old.

Considering this background, combined with the fact that Mr. Fayne's criminal history is non-violent and relatively non-serious in nature, the Court is respectfully asked to depart downward, or laterally, to Criminal History Category I.

17

**VI.**

**DEFENDANT'S PERSONAL AND SOCIAL HISTORY, AND THE TOTALITY OF MITIGATING CIRCUMSTANCES, ARE COMPELLING FACTORS TO BE CONSIDERED IN RELATION TO 18 U.S.C. § 3553(a) AND SUPPORT OF THE REQUESTED NON-CUSTODIAL SENTENCE**

In <u>Gall v. United States</u>, 552 U.S. 38 (2007), the U.S. Supreme Court advised that in addition to considering the Guidelines, the "district court should…consider all the 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [the court] may not presume that the Guidelines range is reasonable.  [The court] must make an individualized assessment based on the facts presented." <u>Gall</u> at 596-597.

Furthermore, "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" <u>Pepper v. United States</u>, 562 U.S. 476 (2011), quoting <u>Koon v. United States</u>, 518 U.S. 81, 113 (1996). The Supreme Court has found that "[u]nderlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'" <u>Id</u>. at 1240, quoting <u>Williams v. People of the State of New York</u>, 337 U.S. 241, 247 (1949). The Supreme Court has "emphasized that [h]ighly relevant – if not essential – to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."

18

In keeping with the above and in the spirit of 18 U.S.C. §3661, the following social history information concerning Arthur Fayne is presented.  This information is derived from a series of interviews with Arthur and members of his family, as well as dozens of character reference letters submitted on his behalf.  The letters are attached as Exhibit A.

A. *General Information/Family Background*

Arthur Fayne was born on November 27, 1962 in Cleveland, Ohio.  Arthur is one of ten children born to Minnie Fayne, who died of a heart attack in 2008.  Arthur's father, Walter Richardson, had five children with Arthur's mother, but essentially abandoned the family before Arthur was born.  Walter Richardson worked as a bricklayer and died in 1980, also of a heart attack.  Arthur's mother was an alcoholic who survived on government assistance and had difficulty raising her children on her own.  Arthur reports that his mother stopped drinking when he was fifteen years old, and his life became more stable after that.

B. *Childhood Upbringing*

Arthur grew up in Cleveland's Hough neighborhood.    According to the *Encyclopedia of Cleveland History* (produced by Case Western Reserve University):

> Hough was a predominantly white middle-class
> neighborhood until the 1950s. By 1960 it had undergone a
> dramatic reversal: from 5% non-white in 1950 to 74% non-

white in 1960. But well before this transition Hough

already was feeling the effects of overcrowding, aging

housing stock, and a decline in the percentage of owner-

occupied dwellings…

Absentee landlords converted many of Hough's single-

family dwellings into rooming houses and tenements. In

1956 the neighborhood was an uneasy mix of long-time

residents, whether white recent migrants from

Appalachia or Black recent in-movers. In a series of

articles in Feb. 1965 the Cleveland Press reported that

Hough was "in crisis." Racial violence erupted on the night

of 18 July 1966, marking the start of the devastating Hough

Riots. Over five days, four African Americans were killed

[one of them was Arthur's cousin], 50 people were injured,

and scores of structures were destroyed. By 1980, the

neighborhood's population had declined to 25,330—down

from a peak of 65,694 in 1950.

Arthur's sister Paulette Lofton lives in Cleveland and worked as an addiction

counselor for several years.  In an exceedingly poignant letter written on Arthur's

behalf, Ms. Lofton states:

There has been many incidents that occurred such as my mother got shot with a shotgun in her back.  Someone was shooting at my oldest cousin rest his soul he jumped in front of my mother as a protection shield the bullet missed him and hit her.  She was fighting for her life we were young and had to be split up staying with family and friends which was one of the most devastating times in our young lives, because we were not treated very well.

Another incident my mother was in an altercation with her brother which resulted in Uncle Walker hitting her in the stomach with a hammer then started pouring gasoline around the house setting it on fire which caused us to relocate to other family and friends houses again, but this time my oldest brother had his own house and took us in so we didn't have to stress over food or clothing…

Our father Walter was a passing in his life in the fact of disowning Arthur stating that he is not his son.  Arthur was young and really did not have any feelings about him that I knew of.

Michael Fayne, age 63, is Arthur's older brother.  Michael lives in Cleveland

Heights and works as a custodian.  Though older, Michael always refers to Arthur as his big-little brother because of the efforts Arthur made to help his mother and his siblings and to keep the family together.  Michael recalls in his letter:

> Arthur and I are from a very large family of ten kids, and
> we were all raised by our single mother in housing projects
> and some of the roughest neighborhoods in the city.  Even
> though we did not always have a lot, we all had each other.
> Arthur encouraged all of us even though he was one of the
> youngest kids. Arthur was the first kid in our family to
> graduate from high school and college. Most of Arthur's
> life has been focused on helping kids and others who
> struggled like we did coming up.

Arthur's sister Emma Lawrence, 70, lives in Kansas City, Missouri and is employed as a funeral home worker.  In an interview conducted in preparation of this memorandum, Emma reported:

> I didn't grow up with Arthur but I stayed in Ohio during
> several summers when I was young.  I was raised by an
> aunt and uncle and I believed they were my biological
> parents for most of my childhood.  I still consider them my
> real parents.  I didn't know that Arthur's mother was also

my mother until I was 12 years old and I started spending those summers with them.  They had a bad life that I wasn't used to.  His mother was always drinking and hollering and cussing.  I wasn't used to that kind of thing.  And they sometimes didn't have enough food.  I never had to go without so that's another thing I wasn't used to.  I lived in Ohio for about four summers and I never did like it.

Like Michael, Emma appreciated the efforts Arthur made to take care of the family, despite all the difficulties.  In her letter, Emma observes:

I am very close to Arthur. I am proud of Arthur's accomplishments, he grew up in the inner city poverty stricken. He always was a smart young man, he worked as a child helping his mother make ends meet. There were 10 Children in the home 11 with our mother. He said I am going to College and get an education so I can help my family. He finished College and made a wonderful life for his self and family. He has helped everyone in the family when in need.

Arthur's brother Michael adds in his letter:

23

He is also the kind of person that will continue to find ways
to do much good in our community to make life better for
people who struggle.  I know this is true because Arthur
encouraged and helped me to become a better person after I
was released from prison.  After I was released, like many
others, I had a hard time finding a job and Arthur taught me
how to look for a job and I found one.  I have been at my
job now for more than 10 years, I live in my own home in
South Euclid, and I am a better man today because of
Arthur's help and encouragement.

In a series of interviews, Arthur himself talked extensively about his
upbringing.  He relates that the family moved often because his mother could not
keep up with rent and they always lived in sub-standard housing.  Arthur remembers
roaches crawling on the walls and rats that he would shoot with a BB gun.   In this
environment Arthur did everything he could to keep himself occupied outside of the
home:

I played basketball all the time.  We would shovel snow off
the court so we could play in the wintertime.  I got to be a
good basketball player.  I was a mediocre student until I
started working harder on my studies so I could stay

24

eligible to play basketball.  Another thing that helped me

with school was things got more stable when I was about

fifteen and my mother stopped drinking.  I wound up being

Vice-President of my senior class and served on the student

council and as a peer counselor.

Arthur played basketball year-round on local courts, in rec leagues, and on school teams.  He often played at Thurgood Marshall Recreation Center, where years later he would become Executive Director.  Arthur was captain of his high school basketball team at Lincoln West High School in his junior and senior years, and of his college team at Thiel College in Pennsylvania his freshman and sophomore years.  After he finished college he played semi-professional basketball for a year in Taipei, Taiwan.

Basketball remained a constant throughout Arthur's life, as attested in some of the attached letters.  Tony Harris met Arthur when he was his son's basketball coach.  Mr. Harris writes:

I met Arthur as "Coach Arthur" during 3rd grade basketball

tryouts for my son Cameron.  Cameron joined and

remained with Coach Arthur's "4Kids" basketball program

from 3rd grade up to his graduation from high school…

Many of the children that played basketball with my son
each year did not have the parental support, financial
support, or what may be termed "stable" home lives that
my wife Stephanie and I, as well as Arthur and Gina
provided for our children.  For those kids, Arthur was there
as a surrogate to fulfill those shortcomings… He took the
place of "no show" mothers or fathers and would often
show up to support a player in important moments in their
lives.  When there was no money to pay participation dues,
he would create scholarships for those with no way to pay,
create long-term payment plans for those who couldn't pay
right away, or forgive dues for those who struggled to pay
but had other bills that were more pressing.

Franklin Myles is a State Farm Insurance agent in Cleveland Heights.  Arthur
began coaching his son when he was ten years old.  Mr. Myles observes:

Arthur's 4K program did not just focus on basketball.
Arthur's goal was to help inner city young boys and girls
develop life skills that they can carry with them always.
My son benefited from Arthur's direction, leadership, and
guidance.

26

C. *Employment History/Civic Service*

Arthur has been working since he was very young.  Arthur's brother Clifford Fayne, 67, lives in West Memphis Arkansas and is a maintenance worker at a McDonald's franchise.  Although Clifford is six years older than Arthur, like their brother Michael, he also refers to Arthur as his big brother.  In his interview conducted in the preparation of this memorandum, Clifford related:

> Arthur always had a job.  He used to sell pop bottles and he
> had a paper route.  There was a man down the street who
> had a brickyard and he would pay us five dollars to stack
> 500 bricks.  I didn't go to school past fifth-grade but I
> made sure everybody else finished high school and we all
> made sure Arthur went to college.  He always wanted to be
> a white-collar guy.  Anything to do with business he was
> on it.

Arthur graduated from Thiel College in Greenville, Pennsylvania in 1986 with a bachelor's degree in psychology.  At Thiel he was President of the Organization of Black Collegians, Social Chairman Lambda Che Alpha Fraternity, and captain of the basketball team.

Arthur has over 30 years of experience in community service and development.  In 1998 he founded 4K programs, a non-profit dedicated to

improving the social and economic vibrancy of major cities.  Before launching 4K,

Arthur was the Director of Cleveland's Thurgood Marshall Recreational Center

from 1986 until 1994.  He also worked as Executive Director of the UAW Ford

Motor Company's Family Service and Learning Center.  In this position he

successfully opened six family service centers in various plants throughout Ohio.

Since 2009 Arthur has owned Business Development Concepts (BDC).  BDC

is primarily engaged in real estate development projects emphasizing what Arthur

calls "health and wellness domains in urban markets."  Throughout his career

Arthur has always been heavily involved in community service and development,

especially in his hometown of Cleveland.  The individuals with whom he has

worked over the years have nothing but high praise for Arthur's abilities and

commitment.  Most of the people who have worked with him and submitted letters

have known Arthur for decades.

Edward McGhee is Pastor of True Vine Missionary Baptist Church in

Cleveland.  He has known Arthur for over thirty years.  Pastor McGhee observes:

> I met Arthur in 1990 when I was employed as a Youth
>
> Counselor at the Christian Family Outreach Center, located
>
> at 8219 Hough Ave. which was about a two block distance
>
> from where Arthur was working as a staff member of
>
> Councilwoman Fanny Lewis. I was impressed by what I

saw in Arthur, which was a young vibrant, high energy,

articulate individual, who I personally believed had the

capacity to be successful in any endeavor of life he chose.

I still believe that he has the ability to be a positive

contributor to the city of Cleveland and the surrounding

communities, in spite of the crimes he has committed. In

my humble opinion, I believe that he is not a career

criminal minded person…

Arthur was instrumental in establishing "Mid Night

Basketball," an outreach initiative that addressed the need

for venues being available to deal with the"inner-city" gang

problems of the city. Arthur led the charge to convince

Councilwoman Lewis to provide funding for "Summer

Camps" which were held at The Christian Family Outreach

Center. Arthur did a lot of "good things" with his skills and

God Given talents. I am confident in saying to you that

Arthur Fayne is not a throw away individual.

Kimberly Sanders is Director of Community Outreach and Patient Navigation

at the Cleveland Clinic Foundation.  She has known Arthur for over 25 years.  Ms.

Sanders writes:

During my relationship with Arthur Fayne, I have experienced an individual who shows sincere compassion and commitment to the community.  I've observed on many occasions Mr. Fayne providing support to community members both young and old through employment opportunities, food delivery, transportation, and most importantly a sincere listening ear.  In addition, Mr. Fayne has always exhibited himself as a kind, thoughtful person.  Arthur Fayne is a family man who has always presented himself as a caring husband and strong but gentle father.

I have also had the pleasure to also work with Mr. Fayne professionally.  He has always displayed a hard-working ethic.  He comes in early and does not hesitate to work late.  He shows appreciation and gratitude to his staff through his continuous thoughtfulness and leadership.    Mr. Fayne is always seeking ways to improve impoverished communities and make life better for those less fortunate.  To that end, it would be devastating to his family as well as the community to lose Mr. Fayne to imprisonment.  I am

more than certain that Mr. Fayne is both encouraged and
devoted to performing his daily actions with the utmost
respect.  I maintain my stance to admire the good that Mr.
Fayne has provided for his family, the community, co-
workers, and colleagues. For this reason, I would support a
sentence of probation with restitution, community service,
or home confinement.

Miguel Sanders is Director of the TRiO/ Upward Bound program at Case
Western University and a former Marine.  In his letter, Mr. Sanders offers the
following assessment:

As the Executive Director of TRIO Programs at both
Cleveland State University and Case Western Reserve
University I had the privilege of observing Mr. Fayne in
action.  His uncanny ability to reach today's youth was
paramount in teaching them leadership skills and providing
essential life skills to an underserved population.  While
many participating students lacked drive and vision to create
a sustainable lifestyle for themselves. Mr. Fayne was able to
meet them in their respective environment and broaden their
horizons to imaginable and achievable life goals…

I have been knowing Mr. Fayne for over 30 years and he is
still one of the most influential people that I know in a
positive way.  Mr. Fayne has positively impacted hundreds
of students from the greater Cleveland area and helped them
to go to college.  Also, Mr. Fayne has directly helped to
reduce the recidivism rate amongst youth who struggle to
make good choices.  Mr. Fayne often redirects students and
provide them with better options to accomplish appropriate
goals.

In a letter written on behalf of herself and three of her family members Erica
Dunham, who has also known Arthur for over 30 years, attests:

Mr. Fayne was very invested in the community and always
had us involved with community activities and community
service. It was through him that we learned how to give
back and to help those in need. He ran his own
organization for kids who were school aged. This program
helped under privileged children with college admissions,
college recommendations, leadership courses for
entrepreneurship, and connections for those who decided
against higher learning and wanted to enter the work force.

> In addition to academics, he gave kids an opportunity for movement and exercise with basketball leagues, cheerleading, etc. Growing up around a man who was so involved with investing in others' lives left a lasting impression that shaped us into the people we are today. Because of him, we knew we wanted to go to college, which we did earning our Bachelors and Masters degrees.

### D. *Marriage and Family Life*

Arthur met his wife Gina, now age 58, in 1993 at a singles event hosted by the church that they still attend.  Arthur and Gina married in June of 1994.  The couple has two children, Kendall Fayne, 28, and Kyle Fayne, 26.  Arthur has a son, Arthur D. Fayne, 42, from a prior relationship and he helped raise Gina's s son from a prior relationship, Christopher Jenkins, age 32.  Gina works as an HR consultant.

Just as Arthur has a widespread reputation for dedication to his community, he is also known as, first and foremost, a dedicated family man.  His son Arthur D. Fayne writes:

> As a young single father, he took on the immense responsibility of raising me single-handedly due to my mother's struggles with addiction.  He provided for me, nurtured me, and instilled in me the values of hard work

and kindness. When he married, he not only fathered two more sons, he also welcomed a stepson into our family but embraced him as his own son, demonstrating his boundless capacity for love and acceptance.

Arthur is contrite that he has put his family through this very public legal proceeding and ashamed that they are also suffering the trauma and ignominy of his conviction.  His wife Gina remarks in her letter:

This court proceeding has been tough on him (and our family) and is cause for anxiety and many sleepless nights; however, Arthur always tries to find a rainbow in the midst of a storm.  I support him and know he's looking forward to what God has in store for him once this process has concluded.

Arthur and Gina have resided at 19 Kingston Drive in Aurora, Ohio for over twenty years. Arthur is chagrined that the stability they established for all those years raising their children has been disrupted in such a daunting fashion.  Regardless of the outcome of his case, Arthur will live with the regret generated by his prosecution and conviction for the rest of his life.

Arthur and Gina's children are living on their own now and have built successful careers.  Their son Kendall is a team leader at a Wal-Mart outlet and Kyle

is a sales representative for a pharmaceutical company.  Kyle Fayne reflects in his

letter:

> I believe these court proceedings have placed a toll on
> Arthur.  Knowing how stressed out he has been over the
> last few years, I can see the impact this situation has had on
> him. This situation has been a great learning experience for
> him. Moreover, I think he has many positive goals for the
> future. Understanding his character, I believe he wants to
> continue to uplift the inner city of Cleveland and help those
> in need, the best way he can.
>
> Lastly, my father being imprisoned would have a
> drastically negative effect on not only myself, but the rest
> of my family. Not being able to speak to my best friend in
> times of joy and sadness, would be extremely difficult.
> During the holiday season, he is the glue in keeping all
> extended family together. Moreover, the situational
> knowledge that he provides me regularly is something that
> I cherish wholeheartedly. I would support appropriate
> sanction in lieu of custody because I know Arthur
> understands the importance and gratefulness that that

opportunity presents. He wants to continue to shine a

positive light on his community, and I completely believe

he will do the right thing.

## VII.
## CONCLUSION

Arthur Fayne wants nothing more than to put his life back together and provide for his family and the community as he always has.  He also wants to confront the trauma that he now realizes has dogged him since childhood, and for which only since charges were filed in this case has he ever received any kind of professional assistance to help him.

It is submitted that Arthur Fayne is a worthy candidate for probation.  If probation is imposed, the consequences of any violation of its terms could include separation from his wife and children, and an inability to continue the work that is so important to him.  These are things he would be highly motivated to avoid at all costs.  As evidenced by the attached letters, Arthur has a strong and extensive support network around him and this augurs well for his amenability to supervision in the community and his continued rehabilitation.

It is important to remember that a sentence of probation with a suitable period of home confinement and extended community service, as well as other stringent conditions deemed appropriate, hardly constitutes a slap on the wrist.  Rather, it is real punishment and a "substantial restriction" of a defendant's freedom.  In the

majority opinion in *Gall v. United States*, 128 S. Ct. 586 (2007), Justice Stevens wrote:

> At the end of both the sentencing hearing and the
> sentencing memorandum, the District Judge reminded Gall
> that probation, rather than "an act of leniency" is a
> "substantial reduction of freedom" *Id*., at 99, 125.

In his memorandum provided at the time sentence was imposed, the District Court judge had emphasized:

> Gall will have to comply with strict reporting conditions
> along with a three-year regime of alcohol and drug testing.
> He will not be able to change or make decisions about
> significant circumstances in his life, such as where to live
> or work, which are prized liberty interests, without first
> seeking authorization from his Probation officer or,
> perhaps, even the Court.  Of course, the Defendant always
> faces the harsh consequences that await if he violates the
> conditions of his probationary term.  *Id*., at 125.

On these and the other grounds set forth in this memorandum, Arthur Fayne, through counsel, respectfully requests a sentence of probation with an extended period of home confinement, substantial community service, along with whatever

37

other conditions the Court deems appropriate, including psychological counseling and treatment for compulsive gambling.   Arthur Fayne is a good man who overcame adversity and has built a record of a lifetime of good work. In the New East Side Market project he was trying to do something good that would benefit an underserved community. A jury has found crossed the line in violation of federal law, but above and beyond anything else, there is no loss to NEON or any party, he had no intent to illegally self benefit, and in fact did not self benefit. Without loss, the guidelines are Level 9, and if ever there was a case that cried our for a noncustodial sentence , this is that case.  Given all of the factors mitigation, probation is a sentence that is "sufficient, but not greater than necessary" to satisfy the sentencing factors set forth at 18 U.S.C. §3553(a).  It would also acknowledge the many positive qualities that Arthur has demonstrated consistently since he was a young man, as well as the other mitigating factors presented herein.

Dated: March 4, 2024                            Respectfully submitted,

By      /s/David M. Dudley
         DAVID DUDLEY
         Los Angeles, California
         13415 S. Sepulveda Blvd., Ste. 1100
         Los Angeles, CA 90034

By      /s/Myron P. Watson
         MYRON P. WATSON
         75 Erieview Plaza, Ste. 108
         Cleveland, Ohio 44114

         Attorneys for Defendant
         ARTHUR FAYNE

38